UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

JAMES ORLANDO WASHINGTON,

Plaintiff,

v.                                             CAUSE NO. 3:24-CV-396-HAB-SLC

NANCY B. MARTHAKIS, et al.,

Defendants.

OPINION AND ORDER

James Orlando Washington, a prisoner without a lawyer, filed a complaint. ECF 2. "Under 28 U.S.C. § 1915A, the court must screen the complaint and dismiss it if the action is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. To proceed beyond the pleading stage, a complaint must contain sufficient factual matter to "state a claim that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Because King is proceeding without counsel, his allegations must be given liberal construction. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, a plaintiff can plead himself out of court if he pleads facts that preclude relief. *See Edwards v. Snyder*, 478 F.3d 827, 830 (7th Cir. 2007); *McCready v. Ebay, Inc.*, 453 F.3d 882, 888 (7th Cir. 2006).

On March 24, 2022, at approximately 5:00 PM, Washington alleges he ruptured his patellar tendon while playing basketball at the Indiana State Prison (ISP). He was immediately escorted to the medical unit via wheelchair. Dr. Nancy B. Marthakis and Nurse Jacqueline Monaco examined him and concluded Washington needed to go to the emergency room. He was transported to an outside hospital approximately one hour later where he received an x-ray and was examined by an emergency room doctor. He was diagnosed with a tendon rupture, and that doctor recommended an MRI be conducted "as soon as possible to be certain." ECF 2 at 4. He was prescribed thirty days of naproxen "to help with pain and inflammation," and he was given crutches and a soft immobilizer to keep his leg straight. *Id.* At approximately 8:45 PM, Washington was transported back to ISP. Dr. Marthakis was contacted at home regarding the prescription for naproxen, and she told the nurse to "provide Washington a stock card of acetaminophen for the pain, and that she would do a follow-up in the morning." *Id.*

The next morning, Washington reported to medical on crutches for the appointment. Dr. Marthakis changed his medication from naproxen to meloxicam, and she informed him she would have to "go through a review process" to get approval for the MRI. Within an hour, Dr. Marthakis submitted the MRI request as well as a request for an orthopedic consultation to Dr. Kristen Dauss, whom Washington describes as the Chief Medical Officer for the Indiana Department of Correction (IDOC). On April 18, 2022, Washington was transported back to the outside hospital for the MRI.

On April 26, 2022, Washington spoke to Sherri Fritter, who is not named as a defendant, about the fact he had not been advised of his MRI results. Ms. Fritter told

2

Washington she would "have a medical pass sent to him so that he could talk to Dr. Marthakis about his concerns." *Id*. at 5. A week later, on May 3, 2022, he was seen by Dr. Marthakis, who told Washington he had been approved to see an orthopedic specialist. During that visit, Washington complained to Dr. Marthakis about the "extreme pain he was in" and told her the meloxicam was "helping with inflammation, but was not providing any pain relief." *Id*. Dr. Marthakis gave him a "stock card" of acetaminophen for the pain. *Id*. The following week, on May 10, 2022, Washington was transported to an outside orthopedic specialist facility where he was examined by Dr. Israel Yahuaca. According to Washington, Dr. Yahuaca told him he "would be left with permanent damage" because over six weeks had elapsed since his injury, and he recommended surgery be performed "as soon as possible." *Id*. at 6. In fact, medical records attached to the complaint indicate Dr. Yahuaca recommended surgery and stated he would "obtain authorization for the surgery and get him on the schedule. It is imperative that this get done soon as he is already 1 month out. Further delay *may* affect his outcomes." ECF 2-1 at 3 (emphasis added).

When he got back to ISP, Washington began filing grievances about the delay in treatment. On June 13, 2022, a little over a month after his orthopedic consultation, Washington was transported to the hospital where Dr. Yahuaca performed reconstructive knee surgery. Afterwards, Dr. Yahuaca informed him "the surgery was successful, but that there was permanent damage to his knee because of the long delay of time before being treated." ECF 2 at 7. Washington was transported back to ISP later that night, where he was placed in G-Dorm per Dr. Marthakis's orders and given a

3

"suicide blanket and a dirty mattress." *Id*. at 7–8. He claims he was not given anything to elevate his leg, so other inmates gave him their blankets to do so. He was told he would be started on a prescription of Tylenol 3 the next day.

On June 15, 2022, Washington was seen by a nurse. He told her his pain was "a ten (10) out of ten," so she gave him a Toradol injection. *Id*. at 8. The next day, the nurse was changing his bandages when Dr. Marthakis entered the room and examined his leg. Dr. Marthakis informed Washington he would be able to return to his regular housing unit the following day. Washington asked Dr. Marthakis when he would receive the ibuprofen and hydrocodone that had been prescribed by Dr. Yahuaca. Dr. Marthakis told him Centurion "would not allow her to prescribe ibuprofen" so he would have to purchase it from commissary. She said she would look into "something like arthritic Tylenol" instead." *Id*. When she left, the nurses informed him that Dr. Marthakis was allowed to prescribe ibuprofen "to incarcerated individuals who were dental patients in the facility." *Id*. at 9. Washington's bandages continued to be changed every few days, and when he "complained that his pain was still a ten (10) out of ten and throbbing" and later a "nine (9) out of ten," he was given additional Toradol injections. *Id*.

On June 28, 2022, Washington was transported to the outside orthopedic specialist facility for a follow-up appointment. Dr. Yahuaua "submitted an electronically signed order recommending ibuprofen and Tylenol as needed for pain" as well as physical therapy and a "hinged T-ROM knee brace." *Id*. at 10. That same

4

morning, Dr. Marthakis submitted a request for approval for outpatient physical therapy.

On June 30, 2022, and July 17, 2022, Washington attended his first two physical therapy sessions with Nathan Bates. He described his pain as a "five (5) out of ten" during these sessions, and Mr. Bates used tongue depressors and medical tape as a "point of reference" for flexion because Washington had not yet received the T-ROM knee brace. *Id*. at 11. On July 19, 2022, Washington was measured for the knee brace by Chloe Odle, the medical supplies coordinator. He asked her why it had taken so long, and she said it "had to go through a review process" with Dr. Dauss. *Id*. Washington continued his physical therapy sessions with Mr. Bates throughout July and August. His pain was reduced to a "three (3) out of ten" and a "four (4) out of ten" during these sessions, but he still had not received his T-ROM knee brace. *Id*. at 12.

On August 18, 2022, Washington was transported to the outside orthopedic specialist facility for another follow-up appointment. Washington takes issue with this because it was three weeks beyond the four-week recommended follow-up. He claims Ashley Burnham, the scheduling coordinator, was "in charge of scheduling appointments" and failed to schedule it by the recommended date. *Id*. At that visit Dr. Yahuaca expressed concern that he hadn't received the T-ROM knee brace yet. As an interim solution, Dr. Yahuaca gave Washington an "immobilizer" and a "supportive hinged knee brace designed for sports." *Id*. He noted that it was "not a replacement for the T-ROM brace, because it was incapable of controlling range of motion." *Id*. at 13. Dr. Yahuaca "submitted an electronically signed order recommending ibuprofen and

5

Tylenol as needed for pain" and a "transition from the straight leg immobilizer to [a] hinged knee brace as tolerated." *Id*. That same day, Washington also had a physical therapy appointment with Mr. Bates. He was given the "Don Joy T-ROM hinged brace that had been previously ordered a month prior by Chloe Odle." *Id*. Washington claims Ms. Odle ordered the wrong size, and it was too small for him. Mr. Bates set the ROM from 0–70 degrees and told Washington he would reassess that range during the next appointment. On September 1, 2022, Washington attended another physical therapy session, and his pain was at a "three (3) out of ten." *Id*. Mr. Bates asked him why he wasn't wearing his T-ROM brace, and Washington told him it was because it was too small. Washington had instead switched back to the supportive knee brace provided by Dr. Yahuaca.

Washington states that his "recovery extended to the New Year," during which had had several more follow-up appointments with Dr. Yahuaca and physical therapy appointments with Mr. Bates. *Id*. at 14. He has sued Dr. Marthakis, Ashley Burnham, Dr. Dauss, and Centurion Health of Indiana, LLC, for compensatory and punitive damages, and his complaint outlines five distinct legal claims against those defendants. *See id*. at 14–17.

Under the Eighth Amendment, inmates are entitled to adequate medical care for serious medical conditions. *Thomas v. Blackard*, 2 F.4th 716, 722 (7th Cir. 2021). A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious even a lay person would recognize as needing medical attention. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). However, prisoners are "not entitled to

6

demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019), nor are they entitled to "the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997); *see also Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) ("The Eighth Amendment does not require that prisoners receive unqualified access to health care."). Rather, they are entitled to "reasonable measures to meet a substantial risk of serious harm." *Forbes*, 112 F.3d at 267.

Additionally, it is not enough that a medical professional be mistaken in his or her judgment. The deliberate indifference standard requires something "akin to criminal recklessness," *Thomas*, 2 F.4th at 722, rather than "negligence, gross negligence, or even recklessness." *Hildreth*, 960 F.3d at 425–26. Ignoring an inmate's complaints of pain or delaying necessary treatment can amount to deliberate indifference, particularly where the delay "exacerbates the plaintiff's condition or unnecessarily prolongs suffering." *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (citations and internal quotation marks omitted). However, "[t]o say the Eighth Amendment requires prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment would be absurd." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996).

> Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations. A prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition.

*Id.* (quotation marks and citation omitted). That is why the court must "defer to medical professionals' treatment decisions unless there is evidence that no minimally competent

7

professional would have so responded under those circumstances." *Walker*, 940 F.3d at 965 (citation and quotation marks omitted). "[M]ere disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019) (citation and internal quotation marks omitted). This standard "reflects the reality that there is no single 'proper' way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." *Id.* (citation and internal quotation marks omitted).

It is clear from the allegations set forth in the complaint that Washington suffered an objectively serious tendon injury and received immediate treatment for it at an outside hospital, followed by surgical repair, physical therapy, and continuing care throughout his recovery. The only question, then, is whether that care was constitutionally deficient in some way. Washington asserts Dr. Marthakis "delayed necessary treatment by scheduling the plaintiff beyond the recommended time period of 2-6 weeks for surgery, thus aggravating an injury and needlessly prolonging Washington's pain and suffering." ECF 2 at 14. However, this assertion is directly contradicted by Washington's own allegations. On the evening of the injury, Dr. Marthakis sent Washington to an outside hospital within an hour of the incident where he received emergency treatment including an x-ray. The next morning, Washington admits Dr. Marthakis submitted a request for an MRI and an orthopedic consultation. He received the MRI within three-and-a-half weeks of his initial injury. Two weeks after

8

that, Washington was approved to see the outside orthopedic specialist, and his appointment took place the following week. A little over a month after his initial consultation with Dr. Yahuaca, he received his reconstructive knee surgery.[1] Washington himself asserts that other individuals (whom will be discussed below) were responsible for the review process/approval and scheduling issues. Based on these facts, it's not plausible to infer Dr. Marthakis delayed any necessary treatment such that it violated the Eighth Amendment. *See e.g., Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) (stating that "[f]or a defendant to be liable under section 1983, she must be personally responsible for the alleged deprivation of the plaintiff's constitutional rights" and finding the doctor did not violate the Eighth Amendment because she was not responsible for the time it took to resolve the plaintiff's treatment request). Accordingly, this claim will be dismissed.

Washington also asserts Dr. Marthakis "refused to prescribe Washington ibuprofen medication *or an alternative medication*" which "aggravated and prolonged Washington's pain and suffering, forcing Washington to suffer though the entire post-operative recovery without proper pain management." ECF 2 at 14–15 (emphasis added). Again, however, Washington's assertions are contradicted by the facts set forth in his complaint. He admits Dr. Marthakis prescribed meloxicam shortly after his injury, which was "helping with inflammation, but was not providing any pain relief." *Id.* at 5. Dr. Marthakis then gave him acetaminophen for the pain, and he was

---

[1] He also admits Dr. Marthakis submitted an outpatient request for physical therapy on the same morning Dr. Yahuaca recommended it at the first post-surgical visit on June 28, 2022.

9

prescribed Tylenol 3 (acetaminophen with codeine) and received multiple Toradol injections following his surgery in response to his complaints of serious pain.[2] Washington doesn't assert his meloxicam prescription was ever discontinued. Moreover, he was informed he could purchase ibuprofen from commissary if he wanted to do so.[3] Although Washington repeatedly insists he needed to be prescribed ibuprofen, he is not entitled to demand specific care. *See Walker*, 940 F.3d at 965. Dr. Marthakis prescribed alternative medications for pain and inflammation—two of which are in the same class of NSAID drugs as ibuprofen—and Washington doesn't plausibly allege his complaints of pain were wholly ignored or that he failed to receive any pain medication. The fact that Dr. Marthakis chose different medications than those recommended by Dr. Yahuaca isn't sufficient to state a claim. *See Snipes*, 95 F.3d at 592 ("keep[ing] an inmate pain-free in the aftermath of proper medical treatment " doesn't violate the Constitution, nor does "dissatisfaction with a doctor's prescribed course of

---

[2] Both ibuprofen and meloxicam are nonsteroidal anti-inflammatory drugs (NSAIDs) that "help relieve pain from conditions like arthritis, muscle sprains, or bone fractures. They also help reduce inflammation (swelling), lower fevers, and prevent blood from clotting." *Prescription Nonsteroidal Anti-Inflammatory Medicines*, American Academy of Family Physicians, available online at: https://familydoctor.org/prescription-nonsteroidal-anti-inflammatory-medicines/?adfree=true (last visited Apr. 30, 2025). Meloxicam is a COX-2 inhibitor, which "may be less likely to irritate [the] stomach or intestines" than traditional COX-1 NSAIDs. *Id*. Toradol, the brand name for ketorolac injections, is also in the NSAID class of medications and is "used to relieve moderately severe pain in adults, usually after surgery. . . .. It works by stopping the body's production of a substance that causes pain, fever, and inflammation." *Ketorolac Injection*, MedlinePlus, available online at: https://medlineplus.gov/druginfo/meds/a614011.html (last visited Apr. 30, 2025).

[3] Washington does not allege that he was financially unable to purchase the ibuprofen from commissary. In fact, he alleges a nurse asked him "why he was being forced to order ibuprofen from commissary" (ECF 2 at 10), which leads to the reasonable inference he was able to purchase it. *See Poole v. Isaacs*, 703 F.3d 1024, 1027 (7th Cir. 2012) ("[T]he imposition of a modest fee for medical services, standing alone, does not violate the Constitution.").

10

treatment"); *see also Lockett*, 937 F.3d at 1024 ("We routinely have rejected claims, however, where a prisoner's claim is based on a preference for one medication over another unless there is evidence of a *substantial* departure from acceptable professional judgment.") (emphasis in original)). This claim against Dr. Marthakis will be dismissed as well.

Washington further asserts Ms. Burnham "failed to schedule a four (4) week follow-up appointment, thus aggravating an injury and needlessly exacerbating Washington's pain and suffering." ECF 2 at 15. However, the facts supporting this assertion are sparse. Washington admits he returned to see Dr. Yahuaca approximately two weeks after his surgery for the initial follow-up visit, during which no surgical complications or other issues were noted. One month later during a physical therapy appointment, Mr. Bates "emailed Ashley Burnham, scheduling coordinator to find out why she failed to schedule Washington's follow-up appointment." *Id*. at 12. Three weeks after that, he was transported to the outside orthopedic specialist facility for the appointment, and he admits he attended several more follow-up appointments throughout the new year. At most, the facts show Ms. Burnham may have been negligent by failing to schedule the second follow-up appointment within the recommended timeframe. But, without more, it cannot be plausibly inferred that Ms. Burnham was deliberately indifferent to Washington's needs. *See Hildreth*, 960 F.3d at 425–26 ("negligence, gross negligence, or even recklessness" isn't enough to violate the Eighth Amendment). The claim against Ms. Burnham will be dismissed.

11

Washington next asserts that Dr. Dauss "delayed the plaintiff from receiving a necessary hinged T-ROM brace by prolonging the review process for the plaintiff's treatment, thus aggravating an injury and needlessly exacerbating Washington's pain and suffering." ECF 2 at 16. Again, the allegations related to this assertion are sparse. According to Washington, Dr. Yahuaca recommended the T-ROM brace at the initial post-surgical follow-up appointment on June 28, 2022. Importantly, Washington doesn't indicate when a request for approval regarding this device was forwarded to Dr. Dauss. At a physical therapy appointment two-and-a-half weeks later, Washington had not received the T-ROM brace, but Mr. Bates improvised using medical supplies to use as a point of reference for flexion. By July 19, 2022—three weeks after the initial post-surgical appointment during which the brace was first recommended—Ms. Odle had measured Washington for the brace.[4] It can thus be reasonably assumed that Dr. Dauss had approved the brace on or before July 19, 2022, and Washington does not allege any facts to suggest she intentionally delayed this review process. Accordingly, it cannot be inferred that Dr. Dauss was deliberately indifferent to Washington's medical needs. *See e.g., Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 650–51 (7th Cir. 2021) (doctor not liable for five-month delay to surgically repair prisoner's torn meniscus or twenty-five month delay to reconstruct his ACL, despite continuing pain and efforts to have the surgery approved sooner); *see also Bissessur v. Indiana Univ. Bd. of Trs.*, 581 F.3d 599, 602

---

[4] He claims Ms. Odle measured incorrectly which led to further delays in getting a properly fitted brace, but these actions cannot be attributed to Dr. Dauss. *See e.g., Mitchell*, 895 F.3d at 498 (defendant must be "personally responsible" for the deprivation.")

(7th Cir. 2009) (claim must be plausible on its face and complaint must provide adequate factual content).

Finally, Washington has sued Centurion Health of Indiana, LLC, which is a corporate entity contracted to provide medical care at ISP. A private company performing a state function can be held liable to the same extent as a municipal entity under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). *See Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012) (*Monell* framework applies to private company providing medical care at correctional facility). That said, a corporation cannot be held liable under a *respondeat superior* theory. *Howell*, 987 F.3d at 653. Rather, "[i]n a case against a private contractor that provides healthcare to incarcerated people, the critical question for liability is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it)." *Id.* at 653–54 (internal quotation marks and citation omitted); *see also Johnson v. Cook Cty.*, 526 F. App'x 692, 695 (7th Cir. 2013) (The policy or custom must be the "moving force behind the deprivation of his constitutional rights."). Specifically, a corporation can be held liable for "an express policy that, when enforced, causes a constitutional deprivation." *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005). Additionally, absent an unconstitutional policy, corporate liability may be established with a showing of "a widespread practice that, although not authorized by written law or express [corporate] policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995). The key in these types of claims, however, is to "distinguish between the isolated wrongdoing of one or a few rogue employees and other, more

13

widespread practices. . .. What is needed is evidence that there is a true municipal or corporate policy at issue, not a random event." *Howell*, 987 F.3d at 654 (internal quotation marks, brackets, and citations omitted).

Here, Washington asserts two of "Centurion's official policies, procedures, practices, and customs contributed, and exacerbated Washington's pain and injury." ECF 2 at 15. First, he claims Centurion had a policy of "not allowing on-site doctors to prescribe ibuprofen medication to prisoners unless they are dental patients." *Id*. Even if true, Washington doesn't plausibly allege this policy caused him any additional harm. As described in detail above, he admits he was prescribed at least two other NSAID drugs for pain and inflammation following his injury and during his recovery.[5] The fact that his specific drug of his choice may not have been available for Dr. Marthakis to prescribe pursuant to Centurion's policy doesn't give rise to a constitutional violation considering similar options within the same drug class *were* available. *See Lockett*, 937 F.3d at 1024 ("[T]here is no single 'proper' way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field.") (citation and internal quotation marks omitted)).

Washington also claims Centurion had a policy, procedure, practice, or custom of "prolonged reviews for serious medical needs that require immediate medical attention." ECF 2 at 15. Specifically, he alleges that this custom "prevented Washington from receiving a T-ROM brace in a timely manner to help with the post-operative

---

[5] Dr. Marthakis also told Washington she would "look into something like arthritic Tylenol." ECF 2 at 8.

14

recovery." *Id.* at 11–12. To the extent Washington is alleging there is an actual policy/procedure in place at Centurion that causes medical procedures and/or device approvals to be delayed, he doesn't describe that policy in any way. *See e.g., Howell*, 987 F.3d at 659–61 (noting collegial review process was "not unconstitutional on its face" and finding twenty-five month delay in surgical repair caused by approval process did not violate the Constitution); *see also Swanson v. Citibank, N.A.*, 614 F.3d 400, 403 (7th Cir. 2010) ("[A] plaintiff must do better than putting a few words on paper that, in the hands of an imaginative reader, *might* suggest that something has happened to her that *might* be redressed by the law.") (emphasis in original)). Moreover, allegations of one three-week delay in approving a medical device are insufficient to plausibly suggest there is a widespread custom in place at Centurion that causes these types of constitutional violations. *See e.g., Howell*, 987 F.3d at 654 (isolated wrongdoing and random events do not constitute a "true" corporate policy or custom). Accordingly, the claims against Centurion will be dismissed.

This complaint does not state a claim for which relief can be granted. If Washington believes he can state a claim based on (<u>and consistent with</u>) the events described in this complaint, he may file an amended complaint because "[t]he usual standard in civil cases is to allow defective pleadings to be corrected, especially in early stages, at least where amendment would not be futile." *Abu-Shawish v. United States*, 898 F.3d 726, 738 (7th Cir. 2018). To file an amended complaint, he needs to write this cause number on a **Pro Se 14 (INND Rev. 2/20) Prisoner Complaint** form which is available from his law library. He needs to write the word "Amended" on the first page above

15

the title "Prisoner Complaint" and send it to the court after he properly completes the form.

For these reasons, the court:

(1) GRANTS James Orlando Washington until **June 2, 2025**, to file an amended complaint; and

(2) CAUTIONS James Orlando Washington if he does not respond by the deadline, this case will be dismissed pursuant to 28 U.S.C. § 1915A without further notice because the current complaint does not state a claim for which relief can be granted.

SO ORDERED on  May 5, 2025.

                                                s/Holly A. Brady
                                                CHIEF JUDGE
                                                UNITED STATES DISTRICT COURT